WILLIAM E. L. DILLAWAY *vs.* BOSTON GAS LIGHT COMPANY & others.

Suffolk.    March 21, 22, 1899. — July 1, 1899.

Present: HOLMES, KNOWLTON, MORTON, LATHROP, & HAMMOND, JJ.

*Corporation — Trust — Removal of Trustee — Equity.*

The holder of bonds signed by a corporation, the payment of which is secured by an assignment to a trustee of the capital stock of other corporations by the owners of it, cannot maintain a bill in equity for the removal of the trustee, on the ground of failure by the directors of such other corporations to perform the covenants contained in the assignment, in the absence of an averment of knowl-

edge on the part of the trustee of any of the acts complained of, or of a request by any one for action by the trustee, and no sufficient reason being shown for disregarding the provisions of the trust agreement as to the removal of the trustee and the appointment of another.

BILL IN EQUITY, filed March 4, 1898, against the Boston Gas Light Company, the South Boston Gas Light Company, the Roxbury Gas Light Company, the Bay State Gas Company of Massachusetts, the Massachusetts Pipe Line Gas Company, the Mercantile Trust Company, and the Brookline Gas Light Company, alleging the following facts:

The plaintiff is the owner of certain " United Gas " bonds of the first and second series, and brings his bill in behalf of others also having similar interest. The Bay State Gas Company of Delaware is the owner of all the stock of the Bay State Gas Company of New Jersey.

On or about January 1, 1889, J. Edward Addicks and William E. L. Dillaway were owners of or had agreed to purchase certain shares of stock, being the great majority of all the shares, in certain gas companies, specifically named below, engaged in manufacturing and furnishing gas in Boston.

On or about March 25, 1889, Addicks and Dillaway entered into two written agreements with the Bay State Gas Company of New Jersey and the Mercantile Trust Company of New York, each dated January 1, 1889. In the first agreement, it was provided that, whereas Addicks and Dillaway, called therein the owners, had agreed to purchase 4,800 shares out of 5,000 shares of the Boston Gas Light Company, 5,800 shares out of 6,000 shares of the stock of the Roxbury Gas Light Company, 3,900 shares out of 4,400 shares of the stock of the South Boston Gas Light Company, and 4,993 shares out of 5,000 shares of the stock of the Bay State Gas Company of Boston, and proposed to purchase, if they could advantageously, the residue of the stocks of such companies, and the stock of ten other gas companies in Boston and adjoining cities and towns, having an aggregate capital of $3,180,000; and that whereas, to make such purchases the owners required $12,000,000, and had applied to the trust company to issue certificates to that amount to be secured by the transfer to it of such stocks, and the New Jersey Gas Company desired to purchase the stocks subject

to the pledge thereof to the trust company to secure the $12,000,000 indebtedness, therefore the parties agreed,

First, that the owners should sell their interest in the stocks to the Bay State Gas Company of New Jersey, called in the agreement the gas company, subject to the indebtedness to be created in the purchase thereof; that the Bay State Gas Company of New Jersey would issue to the trust company its bonds in denominations of $1,000 each, to the amount of $12,000,000, with interest at five per cent in gold, each of the bonds to contain a provision for a sinking fund for its redemption at five per cent premium, to be created by a reservation beginning January 1, 1894, by the trust company out of the dividends on the stocks of the companies transferred to it after expenses, taxes, and interest on the bonds, of one per cent of the principal of the bonds; and the bonds to provide further that "if the residue applicable to such reservation be insufficient in amount, the Bay State Gas Company of New Jersey will, on or before the 1st day of April, yearly, in every year, pay to the trustee such deficit."

Second, that, in consideration of the issue of these bonds by the New Jersey Gas Company, and of the transfer to it by Addicks and Dillaway of the stocks of the Boston Gas Light Company, the Roxbury Gas Light Company, the South Boston Gas Light Company, and the Bay State Gas Company to the amounts above stated, the trust company agreed to execute trust certificates to the amount of $12,000,000 payable in gold, bearing interest at the rate of five per centum per annum, payable semi-annually in gold, and agreeing thereon to pay the amount of such certificates to the holders, provided funds were received under the trust agreement sufficient to pay all outstanding certificates, and reciting that they were "all equally secured" by the shares of stock so transferred, and that the holder was entitled to the benefit of the sinking fund to be created in the manner therein set forth, and that if any instalment of interest thereon which becomes payable shall not be paid when demanded, and the default in such payment shall continue for three months, the principal of all such series shall become due and payable in the manner and with the effect provided in the trust agreement, and that the trust company incurred no personal liability.

Third, that the trustee should hold the stocks in trust for the common use and benefit of all certificate holders:

1. To transfer and deliver the stock to the owners or their assigns whenever all persons beneficially interested in the trust have been fully paid.

2. To demand and receive all dividends declared on such stocks, and any and all interest, income, or other profits, and all money or other things of value which might, until the certificates were paid, come to the owners of the stocks; and to "apply such dividends to the extent that they shall be paid or declared out of annual profits and such interest and income" to the payment of its annual expenses and compensation, the payment of taxes, the payment of coupons annexed to the certificates and bonds, and the creation of the sinking fund, and the surplus, if any, to be paid to the owners or their assigns.

3. To purchase certificates for cancellation with the sinking fund.

4. In case of default in payment of interest coupons, or of default in the creation of the sinking fund, either continued for three months, or of default in the performance of any condition of the bonds or certificates or in the agreement contained, the trustee might in its discretion, and should upon request in writing of holders of one fourth in nominal amount thereof, declare the principal of all such bonds and certificates to be forthwith due and payable, and if the principal should become due and so remain for thirty days, the trustee might, and upon the requisition in writing duly executed by the holders of such one fourth interest, and upon tender of proper indemnity for counsel fees and expenses, should sell the stocks and other property, transferred to it under the agreement, by public auction.

5. Until default other than that of the trustee should occur, the trustee "shall, at all elections of directors of the various companies, the stocks of which shall have been transferred to it hereunder, and all elections, by the stockholders, of officers of said companies, vote in respect of the stock so held by it for such persons, duly qualified to become such, for directors of said companies respectively, and for officers thereof, as the owners or their assigns shall seasonably, from time to time, before such election, designate for election."

6. If by reason of a default the owners or their assigns should not be entitled to designate the persons for election as directors or officers, the trustee "shall, in the absence of, and until a designation for that purpose of the holders of such certificates hereby secured and then outstanding, to be evidenced by a request in writing signed by the holders of at least one third in nominal amount . . . when it shall vote for the persons so designated, vote for such persons . . . as it may select."

7. The voting power on any of the shares held by the trustee should never be so exercised as to authorize, permit, sanction, or concur in the creation of any mortgage or lien of any kind upon the property of any of the companies, or the increase of their capital stock or the issue of obligations, or the creation of floating indebtedness or other impairment or diminution of the rights and interests represented by the stocks, and any proxy given by the trustee should express such limitation on its face ; but the trustee might authorize the declaration of a stock dividend to be held by it on the same trusts as the stocks.

8. The trustee might, in respect to stocks held by it, consent to a sale of part of the real estate of any company, provided it be arranged that the proceeds of such sale shall be distributed as dividends on the stock, such dividend to be held by trustees for redemption of certificates.

Fourth, that the owners therein covenanted with the trustee that they would not, and their executors, administrators, and assigns should not, permit or suffer the making or creation of any mortgage or lien upon the property of any company, or increase of capital stock except as provided, or any issue of obligations of any company, or the creation of floating indebtedness by any company, or other impairment of rights represented by stocks, and that none of these things should be created or done; and that persons designated to the trustee for election as officers and directors should be duly qualified, should faithfully perform their duties, and not do or permit mismanagement of the respective corporations.

Fifth, that the trustee was to execute the trusts upon certain terms and conditions, among which was the provision that all the covenants, etc., "may be specifically enforced by any court of competent jurisdiction."

Sixth, that the trustee might be removed at any time by the vote of the holders of one third in interest of the certificates outstanding.

Seventh, that in case a vacancy should at any time exist in the trusteeship by reason of resignation, incapacity, or removal from office of the trustee, or in case of a vacancy otherwise lawfully occurring, notice of a meeting for the appointment of a new trustee should be given the holders of the certificates, stating the purpose of the meeting, and the time and place of holding the same; that at such meeting a successor to the trustee so resigning or removed should be appointed by the vote of the holders of not less than one tenth in interest thereof, then outstanding who should also be a majority in interest of the holders present and voting at such meeting; and that if a new trustee should not be appointed within twelve months after a vacancy should have occurred, the owners or their assigns should apply to the Circuit Court of the United States for the Southern District of New York for the appointment of a new trustee, and any trustee so appointed should be a trust company having its office in the city of New York.

Eighth, that the owners should transfer to the gas company the stocks subject to the lien to the trustee and all their rights under the agreement.

Ninth, that the gas company should perform all the covenants and agreements of the owners, and pay the $12,000,000 when due and payable; also pay to the trustee, if the dividends should be inadequate, the sums necessary for expenses, taxes, interest, and sinking fund, and keep a voting register at the trustee's office upon which all bonds should be entered; and the registered bondholders were declared entitled to vote at meetings of the gas company, and notice of its meetings to such holders were provided for.

At the same time a similar agreement was made between the gas company, the Mercantile Trust Company, and Addicks and Dillaway, as owners of the stocks, reciting the first agreement, and the first lien of the bonds and certificates to be issued thereunder, by which it was provided that $4,000,000 additional bonds should be issued by the gas company to be secured by $4,000,000 certificates to be issued by the trust company, as

security for which a second lien upon the stocks was created in the hands of the trustee. Such bonds and certificates were to contain no provision for a sinking fund, but were in other respects to be issued under the same agreements by the gas company as the $12,000,000 bonds to be issued under the first agreement. The bonds under the first agreement are bonds of the first series, and those under the second agreement bonds of the second series.

The New Jersey Company was organized about February 16, 1889, with a capital of $1,000,000, one of its purposes being the acquisition of stocks or bonds of other companies. Addicks and Dillaway transferred and delivered to the Mercantile Trust Company the shares of stock in the various companies, and the Trust Company certified bonds of the first series to the amount of $9,000,000, and of the second series to the amount of $3,000,000, which were sold in the market, and by means of such sale all the money necessary to make the purchases of stock was raised, except $500,000. Addicks and Dillaway, on March 13, 1889, sold and transferred to the New Jersey Company their interest in the stock of the Massachusetts companies, subject to the lien of the trust company, and the New Jersey Company issued to Addicks and Dillaway $995,000 of its capital stock, and its bonds under the agreements above recited.

On or about April 29, 1889, a special act of the Legislature of Delaware created a corporation under the name of the Peninsula Investment Company, and immediately upon its organization its name was changed to the Bay State Gas Company.

On August 9, 1889, Addicks and Dillaway transferred to the Bay State Gas Company of Delaware the capital stock of the New Jersey Company, and their rights in the agreement of March 13, 1889, and the Delaware Company delivered to Addicks $5,000 cash, and its own capital stock to the amount of $1,995,000, and undertook the performance of the agreements binding on the assignors under such agreements.

The Delaware Company is the owner of all the shares of stock of the New Jersey Company, and the New Jersey Company holds the legal title to the shares of the Massachusetts corporations, subject to the lien of the trust company, and the power to demand proxies upon the stock of the Massachusetts corporations.

The New Jersey Company had no assets, power, or business, except the voting power and the right to demand proxies on the stock of the Massachusetts corporations; and this power is of great value and is the only method of managing the property out of which the bonds and interest are to be paid, and the Delaware Company, by virtue of its control of the stock of the New Jersey Company, exercised its rights to the management of the Massachusetts corporations up to November 1, 1896.

Immediately after November 1, 1896, Albert C. Burrage, Henry H. Rogers, John G. Moore, Frederick W. Whittridge, and William Rockefeller were elected directors of these Massachusetts corporations by virtue of certain proxies given by the trust company, and have ever since acted as directors of all four Boston corporations. On November 1, 1896, they owned 18,000 shares of the total issue of 20,000 shares of the capital stock of the Brookline Gas Light Company, and were also the owners of the floating debt of the Brookline Company to the amount of $1,500,000, and were the directors of that company.

The Brookline Company was the rival in business of and occupied with its pipes the same territory as the four Boston corporations, and the purpose of Burrage, Moore, Rogers, and their associates in obtaining their election as directors of the Boston corporations was to obtain advantages, benefits, and gains to the Brookline Company, and they have administered the same through themselves or their agents or servants who have filled the offices of directors of the Boston corporations in violation of the provisions of the agreements above recited, in that the directors of the Boston Gas Light Company increased its floating debt from $180,000 in the year ending June 30, 1896, to $255,000 in the year 1897, and the floating debt of the Bay State Gas Company from nothing in the year ending June 30, 1897, to $245,000, the present amount.

The plaintiff and others, holders of the bonds, bought them relying on the covenants and agreements contained in the trust agreements above recited, and relying on the fact that the management of the four Boston corporations was intrusted to people of character and reputation in the community, and familiar with the business of manufacturing gas, who devoted sufficient of their time and attention to promoting the welfare of the corporations.

These corporations had a sufficient plant and equipment for their then present and future business, and the making of the loan was further upon the faith that the corporations should be prudently and conservatively managed in the interests of the bondholders; but by the acts of Burrage, Rogers, Moore, and their associates, and the election of themselves, a management opposed to the plan of caring for the business in the manner contemplated by the agreements above recited has been chosen, and the contracts and business which have been entered into have been made for the benefit of the Brookline Company, with the result that the property and business held by the Mercantile Trust Company is rapidly deteriorating in value, and if such management is not speedily changed there will be a loss to the holders of the bonds, to the Delaware Company, and the owners of the equity.

On April 24, 1896, Rogers, Moore, and Burrage entered into an agreement with Henry M. Whitney for the sale to him of a controlling interest in the stock of the Brookline Company and about $1,615,000 of its floating debt; and this agreement, simultaneously with its execution, was indorsed by Whitney to the Delaware Company. Subsequently the directors of the Boston Gas Light Company, acting at the instigation and procurement of Rogers, Moore, and Burrage, made an agreement with the Brookline Company that, if in any year its profits should be insufficient to pay the interest upon its mortgage bonds and upon its floating debt and dividends of ten per cent upon its capital stock, the Boston Gas Light Company should purchase of the Brookline Company enough gas at one dollar per thousand feet to enable the Brookline Company to pay such interest and dividends; and the profits of the Brookline Company had not theretofore been sufficient for such purposes, and these agreements were entered into without right or authority and were in violation of the terms of the trust agreements and in fraud and impairment of the rights of the bondholders.

In the latter part of October, 1896, a new agreement was made between Rogers, Moore, and Burrage on one side and the Delaware Company on the other, by which the agreement with Whitney was cancelled, and instead of the purchase by the Delaware Company of the controlling interest in the stock of the Brookline Company and its floating debt, Rogers, Moore, and Burrage and

their associates agreed to purchase of the Delaware Company a controlling interest in the stock of the Dorchester Gas Light Company, about $1,300,000 of the first series of bonds, and the transfer to them in trust of the voting power on the stock of the New Jersey Company, but the agreement for the sale and purchase of gas between the Boston Gas Light Company and the Brookline Company remained in force.

By the voting power thus acquired, Rogers, Moore, Burrage, and their associates became invested with the control of the four Boston corporations, and at the same time have had control of the Brookline Company, and were bound by the provisions of the trust agreements and by the provisions of the proxies under which they were elected to follow and observe, as the agents of the trust company, all the stipulations and conditions relating to the exercise of their powers as such directors contained in the trust agreements.

The Boston Gas Light Company during the year ending June 30, 1897, paid to the Brookline Company $67,000 upon the pretence that the Boston Gas Light Company had received gas therefor according to the terms of the agreement. The pipes of those two companies are not so connected as to enable such an amount of gas as would be called for by the money so paid, nor any considerable amount, to be delivered. Such payment was a fraud on the bondholders and the owners of the equity in the stock of the four Boston companies, and the conduct of the directors and officers of the Boston Gas Light Company "must be taken to be, under the provisions of said trust deeds, the acts of the agents of said Mercantile Trust Company," and render the latter liable for maladministration.

A portion of the real estate of the Boston Gas Light Company was sold to the Boston Terminal Company in the year 1897 for $700,000, and of that sum $300,000 was used for the payment of dividends and for improvements and betterments, and $400,000 was kept and retained by the officers and directors of the company in violation of the trust agreements.

On or about November 1, 1897, Rogers, Moore, Burrage, and their associates, directors in the four Boston corporations, made an agreement with the Massachusetts Pipe Line Company, which had been incorporated on June 9, 1896, for the purpose of manu-

facturing, buying, selling, and distributing gas, to purchase of it gas for enrichment and distribution at twenty cents per thousand feet for the term of fifty years. The Massachusetts Pipe Line Company has not erected any works or laid any pipes, and does not intend to erect any works or to engage in the manufacture of gas, but intends to purchase gas from the New England Gas and Coke Company, a voluntary association of persons, and receive it into its mains and deliver it to the four Boston corporations.

It was the purpose and intent of the trust agreements that the business should be conducted under the laws of Massachusetts in the methods and manner they designate, and that these gas companies should not engage in any new, untried, or experimental schemes whereby they should incur any liability for indebtedness or hazard their assets. By reason of the requirements of the statutes of this Commonwealth and the demands of the consumers of gas, it is impossible to produce gas for illumination by distillation of coal of sufficient candle power to satisfy the demands of the public, and for this reason the contract with the Massachusetts Pipe Line Company provided that the gas to be furnished thereunder should be capable of enrichment to twenty-five candle power and be a merchantable gas. It is an impossibility to produce a merchantable gas from coal enriched so as to produce a light of twenty-five candle power according to well-recognized methods of enrichment; and the introduction of any gas made and enriched in such manner into the pipes of the four Boston corporations would result in incalculable damage to the business by bringing gas for lighting into disrepute, and would result in disuse and impairment in value of a vast amount of real estate and machinery now used in the business, and would seriously endanger the value of the property represented by the stocks of the gas companies, and would impair and diminish the security of the bondholders in a manner prohibited by the terms of the trust agreements. The experiment proposed to be used by the New England Gas and Coke Company is under a new, untried process, and if it should prove a failure the Boston companies are in danger of being put to great loss and damage. Improvements in manufacturing are constantly being made, and by the contract with the Massachusetts Pipe Line Company the

opportunity for saving money by the use of improved processes would be lost to them.

The principal business of the Bay State Gas Company of Boston is to manufacture and sell to the other gas companies such gas as they needed in excess of what they were able to make with their then existing plant and apparatus, and this contract with the Massachusetts Pipe Line Company will destroy its business and make it impossible for the dividends of the stocks of the other companies to meet the interest payments on the bonds.

For all these reasons it is manifest that the contracts of the four Boston companies and Massachusetts Pipe Line Company is the incurring of an obligation and the creation of a floating indebtedness detrimental to the bondholders. The trustee incurs no liability for the acts of the directors of the gas company.

Rogers, Moore, Burrage, and their associates are interested as stockholders and bondholders in the New England Gas and Coke Company, and that company is the owner of all the stock of the Massachusetts Pipe Line Company, so that, in making the contract between the four Boston corporations and the Pipe Line Company, they acted with a personal interest on both sides of the contract, and for their own advantage and to the injury of the security held by the trustee.

The method provided in the trust agreements for the removal of the trustee is by a vote of one third of the bondholders. No record is kept of such holders, and it would take a long time to get together the necessary number, and the greater portion of the holders are unable to see the danger to their security, and the property is being and will continue to be managed in such a manner as to destroy the security of the bondholders, unless the court shall interfere. The plaintiff was ignorant of the matters alleged until a few weeks last past.

Any application to the trust company to bring any action would be useless, and a delay to apply for a trustee outside the jurisdiction of this court would result in further loss and injury to the property within the jurisdiction, and the active interference of the court of equity is needed to protect the property from irreparable injury by reason of the acts of the agents in-

trusted by the trust company with the care and custody of the properties.

The prayer of the bill was, among other things, that the Mercantile Trust Company might be removed from the position held by it under the trust agreements and a new trustee appointed.

Several persons composing the firm of Brown Brothers and Company, and the owners of " United Gas " bonds, were allowed, upon their petition, to intervene as parties defendant; and various other owners of the bonds were allowed, upon their petition, to intervene as parties plaintiff.

The several defendants, except the Mercantile Trust Company, demurred to the bill, assigning, among other grounds of demurrer, want of equity, non-joinder of necessary parties, and multifariousness; and the Mercantile Trust Company appeared specially and moved that the bill be dismissed as against it, for want of jurisdiction.    Hearing before *Hammond*, J., who reserved the case upon the demurrers and the motion to dismiss for the consideration of the full court.

*E. M. Johnson*, for the plaintiff.

*W. M. Richardson*, for the Mercantile Trust Company.

*J. R. Dunbar*, for Brown Brothers and Company.

*L. S. Dabney*, for the Massachusetts Pipe Line Gas Company.

*W. M. Butler*, for the Brookline Gas Light Company.

*R. M. Morse*, for various gas companies.

KNOWLTON, J.    The demurrers and the motion to dismiss in this case raise numerous questions, some of which it will not be necessary to consider.

If we pass over, for the present, the contention that there is a want of jurisdiction because the trustee is a foreign corporation which cannot be brought into this Commonwealth, that there is a non-joinder of necessary parties, and that the bill is multifarious, we come to the contention of the defendants that in its substantial allegations the bill does not state a case for equitable relief.

All the rights of the plaintiffs and all the rights of the Mercantile Trust Company grow out of the contract creating the trust.    The plaintiffs are not stockholders in any of the corporations mentioned in the bill.    They are holders of certain United Gas bonds signed by the Bay State Gas Company of New Jer-

sey, payment of which is secured by an assignment to the Mercantile Trust Company of New York of nearly all the capital stock of the Boston Gas Light Company, the South Boston Gas Light Company, the Roxbury Gas Light Company, and the Bay State Gas Company of Massachusetts, by two persons who had become the owners of this stock. The trust company holds the title created by the assignment as security for the payment of interest on the bonds, and ultimately of the principal. By another instrument all of this stock, subject to the title of the trust company, was conveyed to the Bay State Gas Company of New Jersey. The assignment to the trust company secured to the owners the right to have the trust company vote at elections for such persons for officers of the respective corporations as the owners should designate, so long as there was no default on the part of the Bay State Gas Company of New Jersey in making payments, and on the part of the owners in performing the covenants by them to be performed under the instrument. In view of the transfer of the equity of redemption in the stock from the owners to the Bay State Gas Company of New Jersey, this right of designation of persons to be voted for at elections of officers was transferred also, and the Bay State Gas Company of New Jersey assumed the obligation to perform all covenants to be performed by the owners, and the owners were relieved from all personal liability for future default or non-performance. The owners, with money obtained or to be obtained from the proceeds of the bonds, acquired the ownership of all of the capital stock of the Bay State Gas Company of New Jersey. Soon afterwards a special act of the Legislature of Delaware created a corporation under the name of the Peninsula Investment Company, and immediately upon its organization its name was changed to the Bay State Gas Company. The owners then transferred and assigned to this company the capital stock of the Bay State Gas Company of New Jersey, with all their rights in the agreement previously made between them and the last mentioned company, and the said Delaware Company thereupon delivered to one of these owners in payment therefor $5,000 in cash and its own fully paid capital stock to the amount of $1,995,000, and assumed and undertook to perform all the agreements binding upon the assignors in the instrument of assign-

ment of the equity of redemption in the stock of the Massachusetts corporations to the Bay State Gas Company of New Jersey. The officers of the Massachusetts corporations have been elected from time to time by votes cast in accordance with the assignment to the trust company, and the interest on the bonds has been paid as it became due.

The bill states a series of transactions whereby Albert C. Burrage, Henry H. Rogers, and John G. Moore obtained control and ownership of the Brookline Gas Light Company, a company occupying a part of the same territory occupied by the companies first referred to, and whereby they also, through the Bay State Gas Company of Delaware, obtained the right to control the vote of the trust company in the election of officers in the companies whose stock was assigned as security for the bonds. It also states that by November 1, 1896, they caused themselves and their associates to be elected directors of these companies, and have ever since acted as such directors. It is alleged that these persons are interested as stockholders and bondholders in a voluntary association called the New England Gas and Coke Company, and that this company is the owner of all the stock in the Massachusetts Pipe Line Gas Company, one of the defendants.

The plaintiffs allege the failure to perform the covenants contained in the assignment to the trustee in various particulars, as follows, namely : that there was an increase of the floating debt of the Boston Gas Light Company and of the floating debt of the Bay State Gas Company of Massachusetts ; that a payment of $67,000 was made during the year ending June 30, 1897, from the Boston Gas Light Company to the Brookline Gas Light Company for a quantity of gas under a contract between the two companies, when in fact the Boston Gas Light Company did not receive so much gas under the contract; that only a portion of the proceeds of a sale of real estate of the Boston Gas Light Company was applied to the payment of dividends or the cost of improvements or the creation of a sinking fund for the payment of the bonds, as the whole should have been ; that on or about November 1, 1897, an agreement was made between the four Boston companies whose stock was assigned and the Massachusetts Pipe Line Gas Company, to

continue for fifty years, for the sale of gas to these companies, which the Pipe Line Company purposes to obtain from the New England Gas and Coke Company, and that this contract is injudicious and detrimental to the interests of these companies, and that the directors who made it were financially interested in the Massachusetts Pipe Line Company and in the New England Gas and Coke Company.

The plaintiffs contend that the objectionable acts of the directors were done by them as agents of the trust company, and that these constitute mismanagement of the trust, for which the trustee should be removed. It seems very clear that the directors are not agents of the trustee, except in the same sense as they are agents of all the stockholders in the corporations. The trust company has had and now has no control over them. So long as the payments were properly made, and there was no default in keeping the covenants contained in the writing it could do nothing in regard to the selection of officers. It was bound to vote for persons designated by the owner of the equity in the stock, which was the Bay State Gas Company of New Jersey, which soon afterwards was controlled by the Bay State Gas Company of Delaware. Later this right of designation was in Rogers, Moore, and Burrage, and their associates. By the terms of the agreement for the trust, the entire control of the four corporations was retained by the owners of the equity in the stock, subject to certain covenants intended for the security of the bondholders. The bill was filed on March 4, 1898. The allegation of the bill is that the power to control the voting for directors was obtained by Rogers, Moore, and Burrage, under an agreement made in the latter part of October, 1896. It does not expressly appear, but it is probable, that there had been either one or two elections of officers between the making of this agreement and the filing of the bill. The only grounds that appear on which complaint can be made against the trust company are either that prior to the last election of officers it should have discovered that there had been a default in the performance of the covenants of the instrument, and should have voted for directors of its own selection unless a designation was made by a request in writing, signed by holders of one third in amount of the bonds; or that, having discovered such default, it should have

attempted by proceedings in equity to set aside the objection-
able acts of the directors and to change the management of the
corporation.

The bill does not show such culpable negligence on the part
of the trustee as to justify a removal of it.   In the first place it
does not state that the trustee had knowledge of any of the acts
complained of.   So long as the interest on the bonds was paid
when due it was not charged with the duty of investigating the
management of the corporations, in the absence of information
of mismanagement from any of the numerous persons interested
in them.   The payment from the Boston Gas Light Company to
the Brookline Gas Light Company for gas is alleged to have been
made during the year ending June 30, 1897, and the agreement
between the Massachusetts Pipe Line Gas Company and the four
companies for the sale and delivery of gas is alleged to have been
made on or about November 1, 1897.   The increase of the float-
ing indebtedness of the Boston Gas Light Company is stated as
having been shown at some time in 1897, and the increase of the
floating indebtedness of the Bay State Gas Company is stated as
having been shown at the time of the filing of the bill.   In the
absence of an averment of knowledge on the part of the trustee,
we cannot assume that it was informed, or knew, of these facts
before the filing of the bill.

The sale of the real estate to the Boston Terminal Company
is alleged to have been made at some time in· the year 1897.
When the full payment was received does not appear.   It may
not have been until just before the commencement of this suit.
It is alleged that of $700,000 received, $300,000 was used for
the payment of dividends and for improvements and better-
ments, and $400,000 was kept and retained by the officers and
directors of the company, in its treasury, as we suppose.   It does
not appear that this neglect on the part of the officers had con-
tinued for any considerable time prior to the bringing of this
bill, and we cannot say that the trustee, in the absence of a re-
quest by anybody, or of any complaint about it, was culpable in
not seeking a remedy in the courts before the bringing of this
suit.   The only remedy expressly given by the trust agreement
is a right to refuse to vote for officers designated by the owners,
and to select officers for itself, unless the designation is made by

the bondholders, and to bring a suit upon the covenants against the corporation liable thereon.  It does not appear that the time had come after this default for action in the election of officers, even if the trustee knew of the default, and it does not appear that the other remedy would have been of value.  Whether it could have proceeded on general grounds to change the management of the corporation by an application to a court of equity depends on facts not sufficiently stated.  It is a sufficient answer to this bill to say that in the absence of an averment of knowledge on the part of the trustee, or of a request by anybody for action by the trustee, we cannot hold the trustee guilty of such gross misconduct or neglect as to call for its removal.  The averment in the bill that such a request would have been useless, without the averment of any facts to indicate it, cannot avail the plaintiffs.  This seems to be only a statement of an opinion which very likely is unfounded.

The plaintiffs as holders of bonds secured by a conveyance of stock in the four Boston companies stand no better than stockholders.  In that capacity they cannot maintain a bill in equity to set aside the contract with the Brookline Gas Light Company or the several contracts with the Massachusetts Pipe Line Gas Company without first seeking relief from the directors of the several corporations in which they are interested, or from the corporations themselves, either by a personal application or by an application through the Mercantile Trust Company, or without stating good reasons for their failure so to do.  The bill contains no sufficient allegations to give them a standing in this particular.  *Brewer* v. *Boston Theatre*, 104 Mass. 378.  *Dunphy* v. *Traveller Newspaper Association*, 146 Mass. 495.  *Hawes* v. *Oakland*, 104 U. S. 450.  *Dimpfell* v. *Ohio & Mississippi Railway*, 110 U. S. 209.

Although the Mercantile Trust Company is made a party, it is not in court, except as it has appeared specially and filed a motion to dismiss.  Ordinarily a proceeding to remove a trustee is *in personam*, and requires the presence of the trustee as a party.  We do not decide that the interests of *cestuis que trust* of stock in the hands of a non-resident trustee, in a corporation organized under our laws, might not be so imperilled that this court properly might take jurisdiction in some form of proceed-

ing, on the ground that the stock has a local quality as property in the home of the corporation, notwithstanding that the certificates are held in another State. However that may be, we are of opinion that the bill does not state a case which gives this court jurisdiction to take the stock out of the hands of the trustee and to appoint a new trustee, in disregard of the provisions of the trust agreement, which expressly authorize such a removal by a vote in writing of one third in interest of the bondholders at a meeting called for that purpose. This agreement also authorizes an appointment of a trustee by the bondholders in case of a vacancy, and in default of an appointment by them within one year it provides for an appointment to be made by the Circuit Court of the United States for the Southern District of New York. It is conceded by all parties that this agreement is valid, and is to be carried out. The methods which it provides for the removal of a trustee and the appointment of a new trustee must be pursued unless good reasons are shown for proceeding otherwise. The bill states no sufficient reason for disregarding these provisions of the agreement, much less any reason which would justify this court in attempting to accomplish the removal of the trustee by virtue of the location of the corporations in this Commonwealth, and by proceedings to which the present trustee is not a party.

As the demurrers must be sustained on other grounds, we do not deem it necessary to consider the contention that the bill is multifarious, or the contention that it is fatally defective for want of parties.

*Demurrers sustained ; motion to dismiss granted.*